IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ROBERT STEED,

                Plaintiff,

v.                                                  OPINION and ORDER

KARL HOFFMAN, FERN SPRINGS,                      19-cv-609-jdp
and MINDY HAMS,

                Defendants.

---

    Plaintiff Robert Steed, appearing pro se, is a prisoner at New Lisbon Correctional Institution. Steed alleges that defendant prison officials delayed in arranging for him to have cortisone injections for his severe spinal pain that were recommended by an outside specialist. Steed brings claims under the Eighth Amendment to the United States Constitution and Wisconsin negligence and medical malpractice law.

    Two of the defendants, Karl Hoffmann and Mindy Hams, are represented by the attorney general's office. These defendants, who I'll refer to as the "state defendants," have filed a motion for summary judgment. Dkt. 27. The third defendant, Fern Springs, has filed her own motion for summary judgment. Dkt. 35. I will grant those motions on Steed's Eighth Amendment claims and a portion of his state-law claims, because Steed released part of his claims by signing a settlement agreement in another lawsuit, he otherwise fails to provide evidence showing that defendants disregarded his health regarding the injection treatment, and he failed to comply with Wisconsin's notice-of-claim statute. I will decline to exercise supplemental jurisdiction over Steed's remaining state-law claims.

PRELIMINARY MATTER

I begin with a motion filed by Steed. He submitted a letter stating that the state defendants would not provide him with imaging results from July 2018 and March 2020, which he says would help prove the progression of his neck and back injuries. Dkt. 50. He says that when he asked his medical provider for those records, the provider stated that he would have to get them from his institution, but the state defendants told him that the images are not in his prison medical file and instead he must get them from his provider. Steed asks for default judgment.

The state defendants respond that the Department of Corrections (DOC) currently has a CD with images from Steed's July 2018 appointment, but at the time of its response it did not have the images from the March 2020 appointment because they were in the hands of a clinic that is reviewing the images for a consultation. The state defendants say that prison HSU staff do not ordinarily have access to the program used to view those images anyway, although they might be able to arrange to view them. They say that Steed himself would have no use for the images, because he doesn't have the expertise to interpret them. They argue that all parties should rely on the written radiologists' reports that interpret the images, just as HSU medical staff do in providing prisoners' treatment.

Whether I consider Steed's motion to be one to compel discovery or for default judgment, I'll deny it. In theory, Steed has the right to view his medical imaging as discovery materials under the control of the state defendants. The state defendants are correct here that Steed would have little practical use for the actual images given that he does not have the expertise necessary to interpret the images but he has access to radiologists' reports interpreting

the images. If this case were going to trial, I'd consider requiring the state defendants to give Steed access to the images.

But the case is not going to trial. Even if Steed could use the images to prove the progression of his injures for purposes of damages, that progression isn't relevant to the claims at hand: there isn't a material dispute over whether Steed continued to feel severe pain from his injuries, and the case ultimately comes down to issues that don't rely on the extent of his injuries as might be proven through imaging. So there is no reason to grant the motion to compel or to grant default judgment against the state defendants.

## UNDISPUTED FACTS

Plaintiff Robert Steed is a prisoner at New Lisbon Correctional Institution (NLCI). Defendants worked in the Health Services Unit (HSU) at NLCI. Defendant Karl Hoffmann is a physician employed by the DOC. Defendant Dr. Fern Springs is a physician who was employed by Premiere Physician Services and who worked as an independent contractor for the DOC on a periodic basis in several prisons in northeastern Wisconsin. Defendant Mindy Hams is a "medical program assistant–associate" employed by the state. Hams is responsible for scheduling the offsite provider appointments for inmates. She is not a medical professional.

Steed has chronic pain in his neck and back stemming from a 2006 car accident. On February 26, 2018, Hoffmann saw Steed for complaints of low back pain and neck pain with numbness in his left arm. Steed did not report any pain, numbness, or tingling in his legs, which Hoffmann would expect to see if Steed had a pinched nerve or something more serious causing the lower back pain. Hoffmann placed an order for Steed to have a physical therapy consultation for suspected left thoracic outlet syndrome. Hoffmann also placed an order for

Steed to get x-rays of his cervical spine (the part of the spine in one's neck) and to follow up with Hoffmann in three months for the low back pain and left arm numbness. Steed's x-rays showed degenerative disk disease in his neck at C5 and C6.

On May 25, 2018, Hoffmann saw Steed for a follow up of his neck pain, now with right arm numbness, and low back pain. Steed had undergone physical therapy for his neck pain with modest improvement. He had plateaued and was discharged from physical therapy. Hoffmann advised Steed to continue stretching and exercising his neck. Hoffmann placed an order for Steed to get an MRI of his cervical spine for potential consideration to see a neurosurgeon.

In July 2018, Steed went offsite for an MRI: it showed degenerative facet changes at multiple levels, as well as neural foraminal narrowing (a reduction in size of the opening in the spinal column through which the spinal nerve exits) at several spots in his cervical spine. Hoffmann referred Steed to the neurosurgery clinic at Gundersen Hospital for a consultation.

On October 29, 2018, Steed had his appointment with the neurosurgeon, Dr. Douglas Hughes. Hughes noted that Steed had "pain complaints all over his back, but the reason he is here to see me today is his neck." Dkt. 43-2, at 295. Hughes noted the MRI showing degenerative disease at the C4–C7 vertebrae. Based on his examination and assessment, Hughes did not recommend surgical intervention for Steed because Steed did not have a specific radiculopathy and his complaint was mainly of neck pain. Hughes recommended that Steed undergo "injections." *Id.* Hughes also noted that Steed did get benefit from ibuprofen but that Steed was worried that continued use of ibuprofen could harm his kidneys.

The injections needed to be performed by an outside specialist. For a DOC prisoner to get an appointment with an outside provider, a DOC advanced care provider (such as a doctor

4

or nurse practitioner) must make a referral. On November 6, 2018, defendant Springs submitted a "request for prior authorization" for Steed to go offsite for "Pain Clinic appointments for injections," with a diagnosis of "Chronic neck pain with radicular symptoms." *Id.* at 106. On November 16, Dr. Paul Bekx, the DOC medical director, approved the request. On November 26, 2018, Springs entered an order for Steed's offsite appointment "for consideration of steroid injections" for "Cervical radiculopathy." Dkt. 40-3, at 2.

Defendant Hams then gathered Steed's medical information and faxed the request for appointment to Black River Memorial Hospital. In December 2018 and January 2019, Hams communicated back and forth with hospital staff to schedule Steed's appointment. Hams does not have any control over the calendar of offsite providers. On January 7, hospital staff told Hams that Steed was scheduled for an appointment on March 11, 2019.

Steed also received other medical treatment from defendant Hoffmann. On November 16, 2018, Hoffmann increased Steed's prescription for ibuprofen to 800 mg, up to twice daily as needed for 180 days. Hoffmann instructed Steed to try combining the ibuprofen with Tylenol. Four days later, in response to Steed's complaints of increasingly severe pain, Hoffmann concluded that Steed should give the increase in ibuprofen more time to work before trying another option.

On January 16, 2019, Hoffmann ordered menthol-methyl salicylate topical cream for Steed's pain. Steed could apply this cream four times a day as needed. Steed says that he had been prescribed that medication previously, and I take him to be saying that it wasn't effective.

On February 19, 2019, Steed sent a health services request asking to change from ibuprofen and give naproxen a try (another anti-inflammatory medication). Steed says that he asked for a change because of increased creatinine levels, which could indicate a potential risk

of kidney damage, but his requests at the time did not include a comment about that problem. Dkt. 43-2, at 151. Heavy long-term use of non-steroidal anti-inflammatory drugs (NSAIDs) can damage the kidneys. Steed's creatinine levels were indeed elevated slightly over the high end of the normal range, but without other symptoms, such as protein in his urine, Hoffmann considered it unlikely that Steed was suffering loss of kidney function. On February 23, 2019, Hoffmann placed an order for naproxen 500 mg for Steed to take for his pain twice daily as needed for one year. (Naproxen is also an NSAID and neither party explains why or how a change from ibuprofen to naproxen would address Steed's concern about kidney damage).

Also on February 19, Steed submitted another request, addressed to Hoffmann, asking to be prescribed a transcutaneous electrical nerve stimulation (TENS) unit to use on his back until he received cortisone shots. A nurse responded to this request instead of Hoffmann, stating that Steed should speak to the physical therapist about a TENS unit at his upcoming appointment. Steed did not bring the issue up with his therapist; he received a TENS unit from a nurse practitioner in March 2020.

On March 11, 2019, Steed had his appointment at the hospital pain clinic. Steed saw Dr. Stephen Endres. In his notes, Endres stated that Steed "is very certain that his symptoms are his low back and leg pain." Dkt. 43-2, at 205. Endres diagnosed him with cervical degenerative disease and degenerative lumbar spine disease. Instead of a cervical injection as contemplated by Dr. Hughes, Endres injected Steed with local anesthetic "around the nerves and lumbar spine." *Id.* Endres said that he would "tentatively see if Dr. Hoffman[n] will have him come back in about four weeks, and we can address his neck issues." *Id.* I infer that it would have been unsafe for Endres to give him both back and neck injections within a certain period of time.

On March 19, 2019, Hoffmann saw Steed, who reported that he was still active, including running up and down the basketball court. Hoffmann concluded that Steed's ability to play full court basketball meant that his pain was under adequate control and that he did not need to do anything more than continue the current course of treatment at that time.

From April to June 2019, Steed wrote a series of health service requests asking when he would receive a neck injection. Nurses responded stating that staff was in the process of scheduling a new appointment or that an appointment had been scheduled and that Steed would be getting an injection soon. On June 21, 2019, Steed submitted a request stating that he was experiencing a sharp pain near his kidney and asking for an MRI. Hoffmann responded the same day, saying, "we will start with screening labs and reschedule the visit to the pain clinic." *Id.* at 176. Steed's medical records show that he had a comprehensive metabolic panel taken in late June 2019. *Id.* at 69–70. Neither party explains what happened next with Steed's treatment or how the next injection appointment was scheduled.

In June 2019, Steed asked a nurse for a replacement Velcro lumbar support brace because the Velcro was wearing out in the one he had. The nurse asked defendant Hoffmann about the brace, and Hoffmann referred Steed to the physical therapist to consider that item. He ultimately received the brace in August 2019. Steed had made a request about the brace in March 2019 but a nurse responded to that request without discussing with Hoffmann.

On July 22, 2019, Steed had another offsite appointment at the hospital pain clinic. At this appointment, Dr. Endres gave Steed an injection at C6-C7 on the left cervical spine.

Steed filed his complaint in this lawsuit on July 25, 2019. The complaint is dated June 27, 2019. In September 2019, Steed saw Hoffmann and he requested to go back to the pain

7

clinic. Hoffmann entered an order for a pain clinic consultation appointment that same day, and in October Steed received another epidural injection in his lumbar.

## ANALYSIS

Steed brings Eighth Amendment and Wisconsin-law negligence claims against defendants Hoffman, Springs, and Hams for delaying the cortisone shots recommended by Hughes in October 2018.

**A. Eighth Amendment**

The Eighth Amendment prohibits prison officials from acting with conscious disregard toward prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). The parties appear to agree that Steed's neck and back conditions and associated pain were serious medical needs.

A defendant "consciously disregards" an inmate's need when the defendant knows of and disregards "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel

and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

1. **Release of claims**

The state defendants contend that Steed released his claims in this case by signing a settlement agreement in an earlier case in this court, *Steed v. A-Unit 3 Shift Officer*, No. 14-cv-747-jdp (W.D. Wis.). The "Mutual Release and Settlement Agreement" that Steed signed in that case released the DOC and its employees or agents from claims "that relate to any action or inaction—of any State of Wisconsin or DOC employee—that took place on any date before this agreement is fully executed." Dkt. 33-1, at 2. Steed signed the release on February 27, 2019, it was signed by the state the next day, and Steed filed this lawsuit several months later, on July 25, 2019.

I agree with the state defendants that the portions of Steed's claims concerning events occurring before the release must be dismissed because they were released by Steed under the plain language of the settlement agreement in the '747 case. For instance, defendant Hams's actions in working with hospital staff to arrange the initial March 2019 injection took place before the signing of the settlement agreement, so those claims have been released by Steed. It's less clear whether the release would cover non-state defendant Springs, who was not directly employed by the DOC. Springs does not move for summary judgment based on the release, so I will not consider that defense for the claims against her.

Steed contends that his previous settlement doesn't extinguish all of his claims because at least part of the delay at issue here occurred after he signed the settlement agreement—he received his first shot in his lumbar area in March 2019 and the first shot in his cervical spine area in July 2019. The release explicitly states that Steed reserved his rights to pursue claims

9

about "future acts of negligence or deliberate indifference." *Id.* at 3. The state defendants do not limit their release argument to events occurring before the settlement in the '747 case—they contend that all of his claims should be dismissed. They argue that Steed's only exhausted administrative grievance about his claims was fully exhausted before he signed the settlement agreement, *see* Dkt. 43-4, and that under state and federal law, his claims accrued at the time of injury.

The state defendants' exhaustion-based argument fails because the concepts of exhaustion and release are entirely unrelated. The state defendants do not move for summary judgment on exhaustion grounds regarding claims against them for their post-settlement conduct. Even if they had, the fact that Steed released pre-settlement claims wouldn't affect the exhaustion analysis: Steed wasn't required to re-exhaust his administrative remedies as the delay dragged on past the release date. *See Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013) (inmate "need not file multiple, successive grievances raising the same issue . . . if the objectionable condition is continuing").

The state defendants' accrual argument also largely misses the point. It's true that Steed's pain continuing past the date of settlement doesn't in itself create a new cause of action against any defendant for misconduct occurring before the settlement. But I take Steed to be alleging that even after the settlement date, the state defendants continued to act or fail to act in ways that consciously disregarded his pain. The bottom line is that any misdeeds by the state defendants after the settlement date are not covered by the release.

2. **Remaining claims against state defendants**

That raises the question of what Steed is alleging that Hoffmann or Hams did or failed to do after the February 2019 release that violated his rights—keeping in mind that Steed's

claims in this lawsuit are limited to the delay in him receiving cortisone shots. By the time of Steed's settlement agreement, his March 11, 2019 appointment had already been on the books since early January. Steed does not suggest that there was anything that Hams or Hoffmann could have done to get an earlier appointment. Hams states that she didn't have any control over the calendars of offsite providers and Steed doesn't suggest otherwise. So Steed cannot succeed on a claim regarding delays before the March 11 injection appointment.

Steed is correct that the delay in receiving the recommended neck injections continued beyond the March 11 appointment, because he didn't actually receive *neck* injections at that appointment. Instead, Dr. Endres and Steed discussed Steed's back pain, Endres gave Steed an epidural injection in his lumbar spine, and Endres planned to have Steed back for a neck injection at a later date. So this part of the delay in neck treatment was caused by Endres's decision to treat Steed's back pain instead of his neck pain, apparently encouraged to do so by Steed himself.

After that, Steed waited until July 22, 2019, for another appointment, where he indeed received the recommended neck injection. But Steed does not present evidence that the March to July wait was caused by the state defendants' conscious disregard of Steed's needs. It's not clear to me that a fourth-month delay is beyond the standard of care for someone after receiving an epidural, and most patients, prisoners and non-prisoners alike, often experience delays in receiving treatment from specialists.

Even assuming that the delay was longer than what would usually be expected, neither side explains the particulars of how or why the second appointment was scheduled for July, or even whether it was scheduled in the same fashion as the March appointment. I'll infer that Hams was involved in the scheduling because that was her job description, but she has already

11

explained that she doesn't get to pick the dates for procedures; that's up to the offsite providers. At summary judgment, the plaintiff must "put up or shut up" and "show what evidence [she] has that would convince a trier of fact to accept [her] version of events." *Johnson v. Cambridge Indus. Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted). Steed simply doesn't present any evidence that Hams acted with conscious disregard toward his medical problems. So I will grant the motion for summary judgment on Steed's Eighth Amendment claims against Hams.

Defendant Hoffmann argues that he is not responsible for making offsite appointments and so he was not personally involved in any delay. But that is not completely accurate: although the parties do not discuss it in detail, Hoffmann did respond to a June 2019 health service request saying that he'd postpone the second injection appointment to instead perform screening labs to address Steed's complaints of acute pain. And Hoffmann was involved in referring Steed for his third injection in October 2019 (postdating the events of Steed's complaint and thus not part of his claims in this lawsuit).

The problem for Steed is that Hoffmann's decision to prioritize lab tests over the second injection, without more, doesn't show that Hoffmann consciously disregarded Steed's pain. On its face, that was a professional medical judgment that does not raise an inference of conscious disregard. *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016) ("By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment.").

Steed argues that various aspects of Hoffmann's treatment, along with the delay in the second injection, shows that Hoffmann consciously disregarded his pain. When analyzing an Eighth Amendment medical care claim, I must consider the totality of care that Steed received,

not just isolated decisions. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Thus, even though Steed's claims are limited to the delay in his cervical injections, other treatment decisions are relevant in considering a defendant's state of mind toward treating the serious medical need.

Steed says that the topical cream Hoffmann provided him had already proven ineffective, that Hoffmann didn't help him get a TENS unit, and Hoffmann risked damage to Steed's kidneys by continuing with NSAID medication even as Steed's creatinine levels were above the high end of the normal range. But the cream was only one component of Steed's treatment. Steed doesn't show that Hoffmann was personally involved in delaying provision of the TENS unit. And Hoffmann explains why he believed that the NSAID medication was not causing Steed's high creatinine results. The Eighth Amendment does not give prisoners the right to demand specific treatment nor does it guarantee successful treatment.

The medical record shows that Hoffmann attempted multiple other reasonable ways to treat Steed's condition, including Tylenol and NSAID medications, physical therapy, x-rays and an MRI, a referral to neurosurgery, and a referral to the physical therapist to discuss a new back brace. He also promptly arranged for Steed's third injection, which cuts against Steed's belief that Hoffmann disregarded the injection treatment. Given the totality of care that Hoffmann provided Steed, no reasonable jury could conclude that Hoffmann consciously disregarded his pain when he postponed the second injection appointment. Hoffmann's inability to completely alleviate Steed's pain might suggest medical malpractice, or more likely it reflects the unfortunate reality that not all chronic pain can be eliminated. But I will grant summary judgment on the Eighth Amendment claims against Hoffmann.

### 3. Defendant Springs

Defendant Dr. Springs's involvement in Steed's injections is limited to her role in the process for approving offsite medical treatment. Springs reviewed Dr. Hughes's recommendation for injections and submitted an authorization form of DOC approval, and after the injections were approved, Springs wrote an order for the offsite appointment. There were short delays involved in both of these steps: Hughes's recommendation was received at the prison on October 30, 2018, and Springs submitted the authorization on November 6. Similarly, the DOC medical director approved the injections on November 16, and Springs completed the order for offsite treatment on November 26.

These short delays by themselves are almost certainly not long enough to violate the Eighth Amendment. Although Steed's pain was severe, he was receiving other forms of treatment for it and his condition is a chronic one, not an acute injury requiring emergency treatment. In any event, there was a good reason for these delays: Springs worked part time, and she was not working at the prison when the HSU received Hughes's recommendation for injections or when the medical director approved the injections. Rather, she returned to NLCI on November 6 and she completed the authorization form the same day. Similarly, she returned to work at NLCI on November 26 and she completed the order for an offsite appointment the same day. No reasonable juror could conclude that Springs consciously disregarded Steed's problem given how promptly she completed her tasks in the offsite-authorization process. I will grant Springs's motion for summary judgment regarding these actions. And given that there is no evidence that Springs was involved in Steed's medical treatment after those events, Steed cannot maintain any claims against Springs for later events either.

**B. Wisconsin-law claims**

Steed also brings Wisconsin-law medical malpractice or negligence claims against defendants alongside his Eighth Amendment claims. But a federal court generally does not have jurisdiction over a state-law claim unless it is related to a federal claim that is pending in the same case, 28 U.S.C. § 1367, or the plaintiff and defendants are citizens of different states and the amount in controversy is greater than $75,000, 28 U.S.C. § 1332. Nothing in Steed's complaint suggests that he meets the diversity-of-citizenship standard.

Although I am dismissing Steed's federal claims, I will retain jurisdiction to decide the portions of Steed's state-law claims that are clearly meritless because it would be inefficient to leave those claims open for a later state court action. *See Korzen v. Local Union 705*, 75 F.3d 285, 288–89 (7th Cir. 1996) ("The normal practice of course is to relinquish jurisdiction over a supplemental claim when the main claim is dismissed before trial, but if the supplemental claim is easily shown to have no possible merit, dismissing it on the merits is a time saver for everybody.").

Steed's state-law claims about the state defendants' actions before he signed the release of claims in the '747 lawsuit will be dismissed for the same reasons I dismissed Steed's Eighth Amendment claims about those actions. He also does not provide any evidence supporting post-release medical malpractice claims against defendant Springs, so I will dismiss his claims against her.

The state defendants contend that Steed's negligence claims against defendant Hams should be dismissed because Steed failed to comply with Wisconsin's notice-of-claim statute, Wis. Stat. § 893.82. That statute provides that a claimant bringing a civil action against a state employee must serve written notice of the claim on Wisconsin's attorney general within 120

days of the event giving rise to the action. Wis. Stat. § 893.82(3). The notice must include the names of each state employee involved. *Id.* The statute requires strict compliance. *Riccitelli v. Broekhuizen*, 595 N.W.2d 392, 399, 227 Wis. 2d 100 (1999).[1]

Steed sent the Wisconsin attorney general a notice of claim on April 30, 2019, regarding Hams's role in delaying the injections. *See* Dkt. 34-1. But Steed sent this notice by first-class mail, not certified mail, which was the only approved method at the time of the events of this case. Because Steed failed to strictly comply with the notice-of-claim statute, I must dismiss his negligence claims against Hams. *See Sorenson v. Batchelder*, 2016 WI 34, ¶ 46, 368 Wis. 2d 140, 885 N.W.2d 362 (affirming dismissal of action after concluding that personal service did not comply with certified mail requirement of Wis. Stat. § 893.82(5)); *Kelly v. Reyes*, 168 Wis. 2d 743, 744, 484 N.W.2d 388, 388 (Ct. App. 1992) (affirming dismissal of action where plaintiff used "regular mail, not certified mail to serve notice of his claim upon attorney general"); *Thomas v. Mashak*, No. 16-cv-496-bbc, 2017 WL 5195252, at *4 (W.D. Wis. Nov. 9, 2017), *aff'd*, 743 F. App'x 702 (7th Cir. 2018) (notice sent by first-class mail did not satisfy § 893.82).

That leaves Steed's post-release medical malpractice claims against Hoffmann. I decline to continue to exercise jurisdiction over these claims, which will be dismissed without prejudice.

---

[1] The notice-of-claim statute applies only to Steed's claims against non-medical-professional Hams—and not the claims against Hoffmann and Springs—because medical malpractice claims are exempt from the statute. *See* Wis. Stat. § 893.82(5m).

ORDER

IT IS ORDERED that:

1. Plaintiff Robert Steed's motion to compel discovery or for default judgment, Dkt. 50, is DENIED.

2. Defendant Springs's motion for summary judgment, Dkt. 35, is GRANTED.

3. The state defendants' motion for summary judgment, Dkt. 27, is GRANTED with respect to all of plaintiff's federal claims and part of his state-law claims as discussed in the opinion above.

4. Plaintiff's remaining state-law claims are DISMISSED without prejudice under 28 U.S.C. § 1367(c)(3).

5. The clerk of court is directed to enter judgment accordingly and close this case.

Entered January 6, 2021.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge